By the WHOLE COURT.
DAWKINS, J.
Plaintiff brought this suit, via ordinaria, upon two mortgage notes, one for $107,467.66, subject to credits aggregating $68,141.60, and the other for $7,400, and prayed that its lien and privilege be recognized and the property mortgaged sold to satisfy said indebtedness.
Defendant admitted executing the notes and mortgage or deed of trust, but averred that the said “indebtedness to plaintiff has been extinguished as hereinafter set forth.” It further set up certain transactions and conditions tending to establish such extinguishment, and claimed in reconvention a balance of $197,965.45.
There was judgment below for plaintiff for the amount demanded, less certain additional credits shown upon the trial, and rejecting the claim of. defendant in reconvention.
Defendant perfected only a devolutive appeal “from the judgment herein rendered against it dismissing its demand.”
Opinion.
There seems to have been no dispute as to the indebtedness originally due plaintiff on the larger note, and really none of a serious nature as to the smaller one; but the main controversy was over the credits claimed in extinguishment, and the demand in reconvention. 'In fact, the defense as to the main demand was, in effect, a plea of payment, which admitted the debt, and the appeal, as indicated from the above-quoted language, was from that part of the judgment which dismissed defendant’s demand.
On October 31, 1912, plaintiff (hereinafter called the cooperage company) and the Alexandria Barrel Company (of which defendant is the successor) entered into a written contract, wherein it was recited that the said Alexandria Barrel Company was in the hands of a receiver, and it would require about $100,000 to pay off its indebtedness. This sum plaintiff agreed to furnish; and, in consideration of said agreement and the mutual covenants and. stipulations therein made, the barrel company promised do deliver to the cooperage company 1,010,365 white oak and 272,950 red oak staves upon a previous order or contract, and, in addition thereto, 18,-000,000 white oak staves at $40 and 12,000,000 red oak staves at $38 per thousand, f. o. b. Constable Hook, N. J., “of the first party’s (the barrel company’s) own manufacture,” delivery to be made over a period of five years from November 1, 1912, at a minimum rate of 3,600,000 white oak and 2,400,000 red oak staves per year.
We quote the sections of the contract out of which the claim in reconvention arises, as follows:
“Seventh. It is mutually agreed that, if the first party shall at any time fail to deliver at said yards staves at the time and in the manner above provided, or shall fail to promptly ship and forward staves to Constable Hook, N. J., or other designated destination, at the rate of at least 6,000,000 staves a year, in as nearly as possible equal monthly shipments, or shall in any other way default in its performance of this contract, then and thereupon the second party or its agents may enter upon and take possession of all the property of the first party as agent of the first party, and may operate and use the same as such agent in the performance of this contract, for and on behalf of the first party. For all staves delivered by second party to itself, under this performance by it of the first party’s obligations under this contract, the second party shall credit to the account of the first party the amounts per thousand for staves specified' in this contract; but all expenses thereof, including interest on advances, shall be charged to the account of the first party, and deducted from the payments for staves due from the second party to the first party under this contract,' and the first party hereby agrees to pay and reimburse and save harmless the second party for, from, and against all such charges and any excess of the same over the payments1 due to it from the second party.
*593 “Eighth. The first party hereby agrees that at all times during the term of this contract all of its property, factories, goods, papers, and effects shall be open to the full and complete inspection of the second party, or its designated agent; and it is hereby agreed that the second party, during the term of this contract shall have full control over and may dictate the financial policy of the'first party.
“It is further agreed that a designated agent of the second party shall have .charge of the office, the books and the funds of the first party, and also, at the option of the second party, shall have charge of the operations bf. the first party’s plants and manufacture during the term of this contract, and all salary and expenses incident to his employment shall be borne and paid by the first party.
“Ninth. * * * While the second party does not agree to make any other payments or advances than those already hereinbefore provided for, nevertheless it may become necessary or expedient for the second party to make other and further advances to the first party/during (he term of this contract in order to assist the first party in its performance thereof. It is therefore agreed that, if any other advances than those hereinbefore provided for should be made by the second party to the first party, the first party shall repay the same with interest thereon from the date of such payments at 6% per annum, payable semiannually, and shall execute promissory notes therefor at the request of the secohd party, and that the second party may reimburse and repay itself for the same by deducting the amount of such advances, with interest, from the amounts which may become due under this contract from the second party to the first party for thé delivery of staves. It is further agreed that the mortgage or deed of trust hereinafter mentioned shall cover and secure such additional advances.”
A deed of trust was executed at the same time as the said contract, covering all of the property of the defendant, to secure performance thereof; and, as additional security, plaintiff was given an assignment of the capital stock of the defendant in favor of Martin Snider, president of the coopérage company, with an irrevocable power of attorney to vote the same during the life of .the contract involved in this case.
The plants and properties of the defendant company were operated by it from the date of the contract until March 2, 1914, at which time H. D. Williams, president, and the other officers and directors of said company, resigned, and plaintiff, under the assignment and power of attorney to vote the stock, proceeded tp elect a new board and officers. Up to this time the indebtedness to plaintiff had increased rather than diminished, and the operations and deliveries had been so unsatisfactory it was decided to take this action. The arrangement between the parties ,permitted two courses: Under the written contract, plaintiff had the right to take over and operate the property and plants of the defendant as its agent; and the other was the one actually adopted, through reorganization. It made very little difference which plan was adopted, for it was the plaintiff’s voice that controlled the affairs of defendant from that time on.
Defendant contends that it was the duty of plaintiff, after assuming control in the manner which was done, to proceed to operate the property in good faith; that it could and should have acquired sufficient timber for manufacture into staves to fill the contract in its entirety; that, if this had been done and the full 31,283,315 staves had been delivered, there would have been a net profit 'in favor of defendant of $312,S33.15, or sufficient to discharge its indebtedness to plaintiff, and to have left a cash balance in defendant’s favor of $197,965.49, the sum claimed, in reconvention.
Prom November, 1912, to March 1, 1913, the business was under the active management of one Mead, representing the original officers and directors (who, as above stated, were not displaced until March, 1914), and the operations showed a loss during those four months of more than $8,000. At that time,,March 1, 1913, one McKelvey (who had been on the ground from the inception of the contract as the agent of plaintiff) was made manager. Some improvement took place thereafter, but the results even then were far *595 from satisfactory to plaintiff as to deliveries, and on the 1st of March, 1914, as stated, it took entire charge.
The results of plaintiff’s operations from that time on were such that a little more than 15,000,000 staves had been manufactured and delivered when the contract expired on November 1, 1917, and a net profit of $5.38 per thousand had been made for defendant.
We shall not go into a detailed discussion of the evidence upon the subject of whether or not a supply of timber or raw material was reasonably available sufficient to enable plaintiff to fill 'the contract of defendant to itself. It consists of three large volumes of the transcript. We shall state our findings of the ultimate facts as follows:
As to the plant at Cotton Valley, defendant was, at the time plaintiff assumed control, bound up with a certain lumber company in a way that it was confined to the timber on the latter’s lands for stave material, and the operation proved so unprofitable it was found necessary to abandon that field and to move the' mill to Alexandria. There was some testimony to the effect that a large quantity of timber was available in that locality, but it was mainly by a former officer of defendant company, who had not visited the locality for about 24 years; and we think defendant, plaintiff in reconvention, failed to show by a preponderance of the evidence, as it was bound to do, that the timber was there, reasonably available to defendant in its circumstances, and that plaintiff in bad faith refused to obtain it. Mechem on Agency (2d Ed.) vol. 1, p. 935, § 1286, and authorities cited in footnote.
As to the mill at Whitesville, the territory was of such a low swampy nature, and the period during which bolts could be had was so limited, it was not profitable to operate the plant there, and it was also moved to Alexandria.
The conditions surrounding these two plants were no different to what they were while being operated by the defendant itself, and from which it had been unable to show anything but a loss.
With regard to the plant at Alexandria, we think it was conclusively shown that plaintiff obtained and manufactured all of the available timber which it could procure, reasonably, during the life of the contract, for the account of defendant. By investing many times the amount of its own debt which it was trying to work out under the contract, and of the value of the property and assets of the defendant, in lands and timber, it might have been possible-to get enough stave timber to manufacture and deliver the quantity of staves which defendant had bound itself to do, but as to which it had grossly failed up to the taking over of its property. However, it was not by any means reasonably shown that this could have been done, and, to have attempted it, plaintiff would have been required to make an investment of several hundred thousands of dollars in lands and timbers of all varieties, most of which would not have been fit for staves, and it would have taken several years beyond the life of the contract for it to have recouped itself, and this would have necessitated the building and operating of sawmills to manufacture the other species of timber, a character of work in which neither it nor the defendant were engaged.
The most valuable and pertinent testimony given upon the issue in question was by a disinterested witness by the name of Weiss, who had, for a few years immediately proceeding the date of the contract in this case, owned and operated a stavemill at Alexandria, and who was, on that account, thoroughly familiar with the conditions in that territory for obtaining timber for staves. He was a man of long experience in the business, being interested in many other large.concerns of a similar character. He had adopted the course of buying the lands and other varieties *597 of timber to get material for .staves, and was soon compelled to give up tbe stave business and engage in sawmilling in order to get his money out of the investments.
Then the defendant itself had been a complete failure in this particular territory, was in the hands of'a receiver, and its president under indictment for obtaining money by false pretenses, when plaintiff came to the rescue. It was only after plaintiff took the plant in charge and adopted new methods of economy of operation that it made any money. During the latter months of the contract it voluntarily increased the prices of staves $2 per thousand over the contract for the benefit of defendant; and even the president of the defendant company testified, at the time of the trial, that plaintiff had acted in the utmost good faith at all times (except one time, when it called for information contained in the books which were then in defendant’s own hands), furnishing it every information, and allowing full access to the books and other records. There is not the slightest suggestion of fraud or unfair dealing, defendant putting its case purely upon the proposition that it was plaintiff’s duty, after having taken over the property, to go out and buy timber, in effect, at all hazards, and, regardless of the amount of money which might be required to invest, to fill the contract.
We know of nothing in the law, and there was certainly nothing in the contract, which required such a course. In fact, in the last paragraph of section 9 of the contract quoted above' it was expressly stipulated that the “second party does not agree to make any other payments or advances than those already hereinabove provided for. * * * ” Plaintiff was bound to conduct the affairs of defendant only as a prudent administrator, and that contemplated a fair and reasonable use of the resources which were at the command of its principal; but it owed no duty to furnish large sums of money for doubtful investment, and which defendant clearly could not have obtained from any other source. See Mechem on Agency, vol. 1, § 1275 et seq.
Dor the reasons assigned, the judgment appealed from is affirmed at the cost of appellant.
OVERTON, J., recused.